Paul S. Haberman, Esq., *Pro Hac Vice*
**THE LAW OFFICES OF PAUL S. HABERMAN LLC**
19 Engle Street, Tenafly, New Jersey 07670 (All Mail)
88 Pine Street, 22nd Floor, New York, New York 10005
Tel: (201) 564-0590
Fax: (201) 767-2087
psh@paulhabermanlaw.com

Attorney for Plaintiff, MMAS Research LLC

### IN THE UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

| | |
|---|---|
| MMAS RESEARCH LLC, a Washington limited liability company,<br><br>Plaintiff,<br><br>      vs.<br><br>THE CHARITE, SMARTPATIENT GMBH, a German Corporation, and DOES 1 through 10, inclusive,<br><br>                  Defendants. | Case No.: 21-cv-01406<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES**<br><br>1. **Breach of Contract**<br>2. **Copyright Infringement Under 17 U.S.C. §§ 101,** *et seq.* **(including, but not limited to 17 U.S.C. § 1202)**<br>3. **Unfair Competition under Business and Professions Code §17200,** *et seq.*<br><br>**JURY TRIAL DEMANDED** |

Plaintiff MMAS RESEARCH LLC (hereinafter "MMAS Research" or "Plaintiff"), by and through its undersigned attorneys, complains and alleges as follows:

1.      Plaintiff is a Washington limited liability company.

2.      Plaintiff is the owner of the "MMAS RESEARCH WIDGET CODE" (the "Morisky Widget"), registered under United States Copyright Registration No. TX 8-816-517 (Registration date December 3, 2019) (the "Morisky Widget Copyright"). The Morisky Widget is an electronic diagnostic assessment protocol to measure and identify medication adherence behaviors, as further described below, and which includes registered translations of the widely used "Morisky Medication Adherence Scale (8-item)" ("MMAS-8") and "Morisky Medication Adherence Scale (4-item)" ("MMAS-4") tests, along with other validated assessments, specifically the Clinically Useful Depression Outcome Scale ("CUDOS") and Clinically Useful Anxiety Outcome Scale ("CUXOS") assessments, which are included in the registered source code of the Morisky Widget as part of its federal copyright registration.

3.      On April 15, 2022, United States Magistrate Judge David W. Christel of the United States District Court, Western District of Washington at Tacoma, issued a Report and Recommendation in case no. 2:21-CV-1301-RSM-DWC ("Report and Recommendation"), a dispute between Plaintiff and defendant DONALD E. MORISKY ("Donald Morisky"), which acknowledged that "MMAS Research LLC holds the Copyright Registration to the Morisky Widget…."  Exh. 1 at page 6, line 22.  Further, the Magistrate Judge acknowledged that "the Morisky Widget is exclusively in [MMAS Research LLC's] control…" Id. at page 8, line 16.

4.      Defendant THE CHARITE ("Charite") is a university hospital located in Berlin, Germany.

5.      Defendant SMARTPATIENT GMBH ("Smartpatient") is a corporation organized under the laws of Germany with offices located at Neumarkter Str. 87, 81673 München, Germany.

6.      Plaintiff is informed and believes and thereon alleges that defendants DOES 1 through 10, inclusive (the "Doe Defendants," and collectively with the above-named defendants, the "Defendants")), are other parties not yet identified who have infringed copyrights that are the subject of this lawsuit, have contributed to the infringement of the

aforementioned copyrights, or have engaged in one or more of the wrongful practices alleged herein.  The true names, whether corporate, individual, or otherwise, of DOES 1 through 10, inclusive, are presently unknown to Plaintiff, which therefore sues said defendants by such fictitious names, and will seek leave to further amend this Second Amended Complaint to show their true names and capacities when their identities have been determined.

7.     Plaintiff is informed, believes, and thereupon alleges that Doe Defendants were, and are, in some manner responsible for the actions, acts, and omissions alleged, and for the damages caused by Defendants and are, therefore, liable for the damages caused to Plaintiff.

8.     Plaintiff is informed, believes, and thereon alleges that Defendants did, at all material times, foresee the nature and extent of the probable consequences of their acts in proximately causing said damages to Plaintiff.

9.     Plaintiff is informed, believes, and thereon alleges that, at all relevant times, Defendants controlled and participated in the acts or conducted alleged herein.

## JURISDICTION AND VENUE

10.     This action arises, in part, under the Copyright Act of 1976, 17 U.S.C. §§ 101, *et. seq*., including all sections created or amended by the Digital Millennium Copyright Act, conferring federal question jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction on Plaintiff's state law claims under 28 U.S.C. § 1367.

11.     Additionally, this Court has original jurisdiction over this controversy for misappropriation of trade secrets claims pursuant to 18 U.S.C. § 1836(c), and diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00 and there is a complete diversity of citizenship between the Parties.

12.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) because (a) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; (b) the unlawful acts of Defendants complained of herein have been committed within this District and have, had, or will have had effect in this District; (c)

the written agreements identified and described more thoroughly below were entered into by the Parties in this District; and (d) the written agreements identified and described more thoroughly below, by their terms, stipulated to jurisdiction and venue in this District.

13.    Venue is also proper in this District pursuant to 28 U.S.C. § 1391(c)(3) because one or more defendant corporations are amenable to personal jurisdiction in this District.

## ALLEGATIONS COMMON TO ALL CLAIMS

### A. Widget History/Standing/Subject Matter Jurisdiction

14.    Plaintiff was founded by Steven Trubow. Prior to this, Mr. Trubow was the Chief Technology Officer ("CTO") of TAL Digital Solutions in San Francisco, California ("TAL").

15.    Mr. Trubow's technological competence is of a very high level. For example, while serving as CTO for TAL, Mr. Trubow led a team of 40 international engineers in Cabo San Lucas, Mexico to provide a post 9-11 real-time risk management system featuring an unprecedented level of security for Presidents George Bush (USA) Jiang Zemin (China), and Vicente Fox (Mexico), among 18 other foreign leaders attending the 2002 Asia-Pacific Economic Cooperation (APEC) Ministerial Meeting.

16.    As the principal of Plaintiff, Mr. Trubow and the MMAS Research team focused on the problem of medication-taking behavior by patients with chronic and infectious diseases.

17.    The result of this research and development was the Morisky Widget, a cloud-based system for assessing and optimizing medication adherence for specific patients based on a set of criteria whose predictive validity has been established at over 90%.

18.    The Morisky Widget generates these assessments by integrating numerous novel electronic translations and original source code with scoring and coding of its own proprietary MMAS-4 and MMAS-8 tests, along with other widely-used tests in the field,

specifically the aforementioned CUDOS, CUXOS, the National Institute of Drug Abuse Modified Assist Screen ("NIDA-Modified ASSIST"), and the Columbia-Suicide Severity Rating Scale ("C-SSRS").

19.    The above-mentioned diagnostic assessments are included in the registered source code of the Morisky Widget as part of its federal copyright registration.

20.    The Morisky Widget includes dimensional scoring, unintentional and intentional non-adherence for the Morisky Widget MMAS-4 and MMAS-8 tests and the severity of depression and anxiety by assessing CUDOS and CUXOS.

21.    Plaintiff has licensed the use of the Morisky Widget to pharmaceutical firms, hospitals and universities, including the defendant CHARITE, in over 80 languages and 100 countries.

22.    It was previously alleged, and then asserted by this Court, that Plaintiff has no articulable intellectual property interest in any permutation of the diagnostic tools the MMAS-4, the MMAS-8, or the Morisky Widget.  However, the <u>preliminary</u> settlement agreement entered into between Plaintiff and former plaintiff Dr. Donald E. Morisky as to that very question following a lawsuit between the aforementioned parties litigated in Washington State (known as the "CR2A"), as it relates to Plaintiff's standing to bring this, or any lawsuit, provides as follows:

"Trubow Party [which Plaintiff is part and parcel of] shall train the Morisky Party in the use of the Morisky Widget (including, without limitation, any code book or other instructional material, if any, identifying database variables and how they are scored) so that they may operate and maintain it as currently constituted and service licensees as presently done by the Trubow Party. Each Party will agree to cooperate in good faith and keep the existing morisky.org website available and running for a transition period to commence upon the execution of this Agreement and to conclude within 60 days of the date the Final Settlement.

"The Morisky Party and MMAR agrees [sic] to provide full access to the Morisky Widget and support as needed to all licensees as long as their licenses to the Morisky Widget are in effect, including adhering to all European Union Privacy regulations (including but not limited to GDPR) and HIPPA [sic]). With regard to any License Agreements that are not assignable, the Trubow Party shall work in good faith to transition the servicing of such License Agreements to the Morisky Party, including without limitation, providing relevant introductions and authorizing the Morisky Party to be an authorized agent of MMAS Research, LLC for the purpose of so servicing such License Agreements through their term.

"The list of Morisky Widget licensees set forth in Exhibit 4 to this Agreement represents the minimum number of all such License Agreements. Donald Morisky agrees to assume all ongoing obligations and responsibilities under all License Agreements assigned or serviced by Donald Morisky by the completion of the Transition Period.

"MMAS Research, LLC and/or Steven Trubow will receive fifty-five percent (55%) and Donald Morisky will receive forty-five percent (45%) (respectively, each Party's "Proceeds Percentage") of the "Net Proceeds" (as defined herein) generated from any "Claim Settlements" (as defined herein). All proceeds of any Claim Settlement payment received from a third-party ("Gross Proceeds") shall be deposited into an attorney client trust account for the benefit of the Parties. The net of such proceeds remaining after the payment of the attorney fees and recoverable costs incurred by the attorney(s) prosecuting any Claim Settlement ("Net Proceeds"), shall be disbursed from the attorney client trust account to the Parties in accordance with their respective Proceed Percentage along with a financial accounting of the same within thirty (30) days of the attorney's receipt of such Gross Proceeds. The expenses of each Party incurred in connection with a

Claim Settlement shall be exclusively born by that Party and shall not be deducted from the attorney client trust account, the Gross Proceeds, or the Net Proceeds prior to disbursement to the Parties."

"As used herein, the term 'Claim Settlements' refers to any settlement agreement entered by MMAS Research and/or Donald Morisky on the one hand and a third-party on the other hand alleged to have infringed the Morisky IP (as defined herein) and/or the MMAS IP, breached a contract or to be liable for any other claim related to or arising from use of the Morisky IP, MMAS IP, or a license agreement for use of the Morisky IP and/or the MMAS IP after January 1, 2017, until the date on which this Agreement is signed by the Parties. The Claim Settlements at issue herein include any Claim Settlement agreements previously signed by Donald Morisky, now pending or existing investigations to be negotiated, finalized, or executed in a final Claim Settlement at any time in the future, which concern refer or relate to the Morisky IP or the MMAS IP. The Claim Settlement *may include a retroactive license for the Morisky Widget and may include corrective measures to be performed by the licensee with the assistance of Steve Trubow, and training and certification to be done by Donald Morisky or Steve Trubow, at the option of Donald Morisky. Fees for training and certification shall be paid to the party training and certifying by the party receiving the training and certification. The 'Claim Settlements' are limited to those set forth and listed in Exhibit 3, attached to this Agreement, as of the date on which this Agreement is signed by the Parties.

"Donald Morisky authorizes MMAS Research, LLC through its attorney(s) to prosecute the Claim Settlements listed in Exhibit 3 from which a Claim Settlement may be sought related to the MMAS-4, MMAS-8, the Morisky Widget, and any related intellectual property, and further agrees to cooperate in any existing

investigations, claims and ensuing litigation of any such claims, whether now pending or to be litigated in the future, including the formal assignment of such claims, if necessary to MMAS Research, LLC. <u>With the exception of any filed, active, lawsuit then proceeding, all prosecution of Claim Settlements by MMAS Research, LLC through its attorney(s) must conclude within two (2) years of the expiration of the Transition Period as described in Paragraph 7 of this Agreement</u>. Any legal actions, including claims for infringement, may be filed in the name of Donald Morisky if required by law, as the owner(s) of the Morisky IP."

<u>Exh</u>. 2 (emphasis added).

23.    The CR2A was signed by all of its parties on or about December 4, 2020. <u>Id</u>.  And in the absence of a subsequent final settlement agreement, <u>by its very terms, there was thus never a transfer of the Morisky Widget copyright or any license for the same over to former plaintiff Dr. Donald E. Morisky, or any of other adverse parties to Plaintiff in the other action</u>.  It accordingly remains with Plaintiff as, the United States District Court for the Western District of Washington, the only other court to interpret the impact of the CR2A found that, as of April 15, 2022, Plaintiff[1] "holds the Copyright Registration to the Morisky Widget[.]" <u>Exh</u>. 1.

24.    Further, the Western District of Washington acknowledged that "the Morisky Widget is exclusively in [Plaintiff's] control [.]" <u>Id</u>.

25.    The Western District of Washington then expressed its hope that former plaintiff Dr. Donald E. Morisky would cooperate with the same.  <u>Id</u>.

26.    It further recognized that the CR2A "authorizes [Plaintiff] to pursue retroactive licensing agreements for the Morisky Widget, and that [the Moriskys'] motion for an order enjoining [Plaintiff] from 'using and selling the Morisky IP' including the 'Morisky Widget'—the copyright registration for which is in [Plaintiff's] name—would halt the process."  <u>Id</u>.

---

[1] The decision itself refers to "Defendants," as Plaintiff and several individuals associated with Plaintiff as named as defendants. As they all lumped together for the decision, it is simply converted to "Plaintiff" in brackets here.

27.    This is because Plaintiff's obligation under the CR2A, as noted by the Western District of Washington, was to "pursue Settlement Claims with known infringers of the Morisky Widget" which "is not yet complete" and thus Plaintiff had to retain the "Registered Copyright to the Morisky Widget because Copyright law prohibits assigning enforcement rights to a third party." Id.

28.    The Western District of Washington further found that, as of the date of its ruling, former plaintiff Dr. Donald E. Morisky had "not shown evidence that [Plaintiff is] actually infringing [defendant Dr. Morisky's] registered copyrights [,]" as Plaintiff averred "that [it] only use[s] the Morisky Widget and associated Morisky IP to facilitate Claim Settlements [as in this matter as to defendant The Charite] with the parties listed in Exhibit 3 of the [CR2A] and to establish a mental-health specific survey that [defendant Dr. Morisky's] counsel signed off on as non-infringing." Id.

29.    Moreover, the Western District of Washington held that "even assuming for the sake of argument that [Plaintiff is] selling licenses to the Morisky Widget in contravention of the [CR2A], [former plaintiff Dr. Donald E. Morisky] still could not provide Copyright Infringement because as provided under the [CR2A] he does not hold the Copyright Registration to the Morisky Widget.  In other words, even if [former plaintiff Dr. Donald E. Morisky] proves to be correct on his claim, it bears no causal connection to [former plaintiff Dr. Donald E Morisky's] alleged loss of control over his copyrights to the MMAS-4 or the MMAS-8, or trademark of 'MMAS.'" Id.

30.    As pertinent to the Second Amended Complaint, the Western District of Washington found that "[t]he fact that the Morisky Widget is exclusively in [Plaintiff's] control is a particularly salient point here because the purpose of a preliminary injunction [as was being litigated] is to preserve the status quo until the case can be heard on the merits…Here the last uncontested status preceding [the Western District of Washington] case is clearly spelled out by the [CR2A]." Id.

31.    It should further be noted that an earlier incarnation of this lawsuit, on December 20, 2019, was filed prior to execution of the CR2A and thus that this matter

should be regarded as subject to the exception of "any filed, active, lawsuit then
proceeding[,]" which may be prosecuted by Plaintiff at this time. <u>Exhs.</u> 2, 14-17.

32.     To reinforce Plaintiff's standing, the Western District of Washington
separately noted in a September 4, 2022 Report and Recommendation that:

> "[Plaintiff, among others] contend that [former plaintiff Dr. Donald E. Morisky] is
> 'flagrantly disregarding the 'status quo' this Court sought to preserve by denying
> [Plaintiff's] motion for a preliminary injunction…The Court disagrees.  In its
> Report and Recommendation, this Court  recognized the [CR2A] authorizes
> [Plaintiff, among others] to pursue retroactive licensing agreements for the
> Morisky Widget, and that granting [former plaintiff Dr. Donald E. Morisky's]
> motion for an order enjoining [Plaintiff, among others] from 'using and selling the
> Morisky IP' including the 'Morisky Widget'—the copyright registration for which
> is in [Plaintiff's] name—would halt that process…However [Plaintiff, among
> others, has] not shown that the communications that they seek to enjoin are
> disrupting the status quo."  <u>Exh</u>. 18 at p. 9.

33.     Despite the foregoing, defendant CHARITE nonetheless previously
depicted Plaintiff as not having any intellectual property interest in the Morisky Widget.

34.     However, it bears noting again that Plaintiff's Morisky Widget, which is
Morisky in name only at present, contains several other widely used medical adherence
tests, specifically CUDOS, CUXOS, the National Institute of Drug Abuse Modified
Assist Screen ('NIDA-Modified ASSIST'), and the Columbia-Suicide Severity Rating
Scale ('C-SSRS').

35.     Each of the aforementioned assessments are included in the registered
source code of the Morisky Widget which, again, belongs to Plaintiff.

36.     Plaintiff's standing, and thus subject matter jurisdiction, is accordingly as
plain as day as to this matter as, for the reasons detailed above, Plaintiff is the
documented legal or beneficial owner of an exclusive right under a copyright and has
found to be the same by another United States District Court within the Ninth Circuit.

**B. Copyrights**

37.    To protect the integrity of the Morisky Widget and protect against counterfeiting, infringing, or unauthorized use, Plaintiff filed for and obtained a certificate of registration for the Morisky Widget from the United States Copyright Office. Exh. 3.

38.    The Morisky Widget copyright, as alluded to above, includes the source code for the Morisky Widget, which itself includes the Morisky Widget diagnostic assessments, MMAS-4, MMAS-8, CUDOS, CUXOS, C-SSRS, and NIDA-modified ASSIST.

39.    Plaintiff has complied in all respects with the Copyright Act and Digital Millennium Copyright Act, as well as all other laws governing copyrights, as to the Morisky Widget copyright.

40.    Plaintiff has been, and still is, the author and exclusive holder of all rights, title, and interest in, and to, the copyrights to the Morisky Widget.

41.    The Morisky Widget diagnostic assessments and the Morisky Widget copyright are vital to ensure that third-party use of the Morisky Widget source code is authorized by Plaintiff and used in compliance with Plaintiff's strict coding and scoring in the Morisky Widget.

**C. Licenses**

42.    Plaintiff permits the use of the Morisky Widget, licensing its copyright and diagnostic assessments, only through a licensing program memorialized in a licensing agreement.

43.    Plaintiff grants clinics, practitioners, and similar organizations, entities, and individuals limited-use perpetual licenses for the Morisky Widget that impose restrictions on the use and disclosure of the coding and scoring of the Morisky Widget diagnostic assessments.

44.    The terms of the licenses granted by Plaintiff are designed not only to protect federally registered rights, but also to protect patients and health care providers from counterfeit or scientifically incorrect diagnostic assessments and inaccurate results.

45.    All Morisky Widget licensees are required to score and code diagnostic assessments, MMAS-4, MMAS-8, CUDOS, CUXOS, C-SSRS, and NIDA-Modified ASSIST in the Morisky Widget and to be trained and certified on the use of the Morisky Widget before administering it on patients.

46.    Licenses for the Morisky Widget are typically structured as a fee for a perpetual license, and there is a charge for each test administered by a licensee, in addition to those included in the cost of the license.

47.    Plaintiff also charges fees for training and certification in use of the Morisky Widget.

48.    The license agreement between Plaintiff and defendant CHARITE, discussed below, expressly forbids disclosure of the Morisky Widget diagnostics assessments coding and scoring without Plaintiff's permission.

49.    Due to Plaintiff's consistent employment of a strict regimen of licensing and supervision, the Morisky Widget has enormous value both economically and for the promotion of health and proper diagnosis of persons suffering from a wide range of chronic and infectious diseases and mental health conditions worldwide.

**D. Pertinent History Between the Parties**

50.    On or about June 30, 2017, and countersigned on July 14, 2017, defendant CHARITE and Plaintiff entered into a written perpetual license agreement for the use of the Morisky Widget (the "Agreement"), copies of which is annexed hereto as Exhs. 4, 5.

51.    In any event, shortly thereafter, representatives of Plaintiff traveled to Berlin, Germany to train and certify the personnel of defendant CHARITE who were going to use the Morisky Widget per the terms of the Agreement.

52.    Unknown to Plaintiff at that time, Defendants had conducted multiple MMAS-8 studies for the development and validation of a phone application known as

MyTherapy, which was and is owned by defendant SMARTPATIENT. There was no license or other permission to use the MMAS-8 for the validation of the MyTherapy application.

53.    Also unknown to Plaintiff at the time that it entered into the Agreement, and at the time that it traveled to Berlin for training and certification, Defendants had also conducted a study using the MMAS-8 which was used to promote the MyTherapy phone app described herein and Defendants appeared in an advertisement for the phone app describing the use of the MMAS-8 for MyTherapy.

54.    Plaintiff is informed and believes, and based thereon alleges, that at the time of entering into the Agreement, Defendants were working on the commercial development of the MyTherapy phone app using the MMAS-8 and the Morisky Widget source code and translations without license or authority.

55.    On August 27, 2017, Plaintiff met with Ms. Claudia Kunze, the project director for defendant CHARITE, and other researchers, at its Campus Benjamin Franklin in Stieglitz, Germany to train and certify them on the use of the Morisky Widget to score and code MMAS-8 tests.  All of defendant CHARITE's trainees were certified on how to meet the license requirement to score and code MMAS-8 tests in the Morisky Widget before they published the MMAS-8 results.

56.    On September 12, 2017, Ms. Kunze wrote to Mr. Trubow, Dustin Machi (also of Plaintiff), and former plaintiff Dr. Donald E. Morisky to ask them what the easiest way would be transfer data semi-automatically, as defendant CHARITE was using the RECAP™ system for documentation, and whether there was a possibility to use an application programming interface ("API").  Exh. 6.

57.    Although Ms. Kunze and her fellow researchers from defendant CHARITE were trained and certified on, and had access to, the Morisky Widget, there was no use of defendant CHARITE's Morisky Widget after September 12, 2017.

58.    Dr. Fabian Halleck, from defendant CHARITE's Department of Nephrology, and who had attended the Campus Benjamin Franklin meeting, informed

Plaintiff that his department had used the MMAS-8 test within the Morisky Widget without license for a study entitled "Adherence and Smartphone Use in Kidney Transplant Recipients: Evaluating the Potential of a Mobile App to Enhance Medication Adherence." Dr. Halleck requested that his study receive a retroactive Morisky Widget license, which was subsequently executed on or about October 23, 2017 (the "Halleck Agreement"). <u>Exh</u>. 7.

59.     On October 23, 2017, the same day that the Halleck Agreement was executed with defendant CHARITE, Mr. Trubow went to Berlin, Germany to train/certify defendant CHARITE's Department of Nephrology on the Morisky Widget.

60.     The Addendum required defendant CHARITE to rescore and recode approximately 888 MMAS-8 tests in the Morisky Widget before defendant CHARITE published the MMAS-8 results.

61.      Dr. Halleck accordingly worked with Mr. Trubow and Mr. Machi to establish the scoring and coding protocol in the Morisky Widget, as required by the Addendum.

62.     Despite the above-referenced correspondence with Dr. Halleck, defendant CHARITE never rescored and recoded the MMAS tests from Dr. Halleck's study in the Morisky Widget. Furthermore, the article that Defendants prepared as a result of Dr. Halleck's study were published in 2018 without approval from Plaintiff. <u>Exh</u>. 8.

63.     On June 3, 2018, at the American Transplantation Society meeting in Seattle, Washington, Dr. Halleck and others from defendant CHARITE's Department of Nephrology, including Drs. Georgi, Khadzhynov, Schmidt, Schrezenmeier, Lehner, Glander, Budde, and Staeck, presented MMAS-8 results from their "Adherence and Smartphone Use in Kidney Transplant Recipients: Evaluating the Potential of a Mobile App to Enhance Medication Adherence" study.

64.     The June 3, 2018 presentation, which was published by the American Transplantation Society, said interest in adherence assistance and recent adherence

measured by the 8-item Morisky Medication Adherence Scale (MMAS-8) were assessed.

65.    Overall, MMAS-8 was 6.8 (1.2), indicating medium adherence. Relationship between MMAS-8, the number of prescribed medications, years after transplantation, and age confirmed in a Cox regression analysis independent correlation of younger age and shorter time post-transplant with worse adherence.  Notably, smartphone penetration was very high among younger post-transplant patients and the attrition rate in app usage at 12 months was 54%.  The study can be found at <u>Exh</u>. 8, annexed hereto, or online at https://atcmeetingabstracts.com/abstract/a-mobile-app-to-improve-medication-adherence-in-kidney-transplant-recipients-analysis-of-a-prospective-interventional-study/.

66.    In the Summer of 2019, Dr. Andreas Meisel of defendant CHARITE and another doctor, neurologist Dr. Benjamin Hotter, contacted Mr. Trubow and former plaintiff Dr. Donald E. Morisky to advise them that defendant CHARITE began a new study and accordingly wanted to get licensed, trained, and certified on the Morisky Widget.  <u>Exh</u>. 9.

67.    Former plaintiff Dr. Donald E. Morisky responded to Drs. Meisel and Hotter that there was a problem with their request, as he was no longer working with Mr. Trubow/Plaintiff by that time and erroneously advised that the Morisky Widget was accordingly dead. <u>Id</u>.; <u>Exh</u>. 10.

68.    On June 30, 2019, former plaintiff Dr. Donald E. Morisky, or someone acting on his behalf, sent an email to defendant CHARITE purporting to have severed ties with Mr. Trubow (and thus Plaintiff) and erroneously stating that he was the only source for MMAS-4 and MMAS-8 licensing agreements going forward. <u>Exh</u>. 11.

69.    The following month, after similar emails were sent to other institutions, Mr. Trubow emailed defendant CHARITE and others and meticulously advised why former plaintiff Dr. Donald E. Morisky's email had no basis in reality and attached numerous documents to bolster his point.  <u>Id</u>.

70.     Despite the foregoing, on July 20, 2019, Ms. Kunze, on behalf of defendant CHARITE, advised that because of the alleged confusion created, the legal department needed more information and attached defendant CHARITE's updated overview of the existing licensing agreements as to the use of the Morisky Widget within two (2) of its studies, MonDAFIS and Berlin AF cohort. Id.

71.     Thereafter, correspondence continued between Ms. Kunze, Annette Schroeder, and others from defendant CHARITE and Plaintiff about the various issues between them, including as to potential breaches/infringements of the Agreement over the prior few years, a meticulous summary of which was provided by Mr. Trubow, on behalf of Plaintiff, on September 13, 2019.  Exh. 12.

72.     In the weeks that followed, defendant CHARITE continued to be difficult with engaging Plaintiff and its counsel, which is exemplified in an October 28, 2019 email by Ms. Schroeder wherein there was a discussion of the need for some higher level of proof than usual as to Plaintiff's then-counsel's Kenny Gross, Esq.'s ability to speak with defendant CHARITE on settlement and requesting a power of attorney despite repeated representations as to his ability to speak for Plaintiff.  Exh. 13.

73.     At the same time as the above-summarized back and forth over counsel, as demonstrated by way of the articles listed below, defendant CHARITE continued to actively publish studies that were violative of the Agreement including several, it was has recently been discovered, which were utilized in American presentations and publications.  Moreover, just as of 2019, over 2,800 tests were performed, 898 of which do not have appeared to have complied with the perpetual license granted to defendant CHARITE by way of the Agreement.

74.     The above-referenced articles included, inter alia, as follows:

- A published study by Dr. Meisel on the ClinicalTrials.gov website, located at: https://clinicaltrials.gov/ct2/show/NCT03097146?term=meisel+MAS+II&draw=2&rank=1 entitled "Managing Aftercare Stroke (MAS): MAS II-A Longitudinal Complex-Interventional Study in Post Rehabilitation Stroke

Patients," which was published without obtain the authorization or permission of Plaintiff.

- Hauesler, G.H., et al. "Systematic monitoring for detection of atrial fibrillation in patients with acute ischaemic stroke (MonDAFIS): a randomised, open-label, multicentre study." Lancet Neurology, 2021. Owned by American publisher Elsevier.

- Hotter, B.; Padberg, I.; Liebanau, A., et al. "Identifying unmet needs in long-term stroke care using in-depth assessment and the Post-Stroke Checklist-The Managing Aftercare for Stroke (MAS-I) study." European Stroke Journal, 2019;

- "The Use of Mobile Health Technology and Behavioral Economics to Encourage Adherence in Adolescents." U.S. National Library of Medicine, 2020, updated 2022;

- Steinert, A., et al. "Effects of a long-term smartphone-based self-monitoring intervention in patients with lipid metabolism disorders." Assistive Technology, 2020 (noted within as the official journal of the Rehabilitation Engineering and Assistive Technology Society of North America/RESNA).

75.   On December 20, 2019, Plaintiff filed a breach of contract lawsuit against defendant CHARITE.  The complaint was filed in the Superior Court of the State of California for the County of Los Angeles.  Exh. 14.

76.   On September 10, 2020, defendant CHARITE removed this action, purportedly under 28 U.S.C. §1338, as a civil action relating to copyright infringement, or 28 U.S.C. § 1332, on the basis of diversity jurisdiction. Exh. 15.

77.   On September 30, 2020, the United States District Court issued an Order to Show Cause as to why the action should not be dismissed for lack of subject-matter jurisdiction, and ordered defendant CHARITE to respond on or before October 10, 2020. Exh. 16.

78.   On February 4, 2021, the complaint was dismissed by the United States District Court without prejudice for lack of subject matter jurisdiction.  Exh. 17.

79.     Thereafter, on February 16, 2021, Plaintiff and former plaintiff Dr. Donald E. Morisky filed a complaint against defendant CHARITE in the United States District Court, Central District of California in Los Angeles.  Docket Entry ("D.E.") No. 1.

80.     On November 4, 2022, the Court dismissed the Amended Complaint that had followed the February 16, 2021 complaint without prejudice and with leave to replead by on or before December 5, 2022.  D.E. No. 47.  The Second Amended Complaint follows and is timely.

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT AS TO ALL DEFENDANTS)

81.     Plaintiff re-alleges each allegation contained in the preceding paragraphs and incorporates them by reference as though fully set forth herein.

82.     On or about June 25, 2017, Plaintiff and defendant CHARITE entered into the Agreement, as discussed above, and attached hereto as Exh. 4.

83.     As stated in Section II(C) of the Agreement: "[Defendant CHARITE] and any sub-licensees agree to be trained and certified in the Morisky Widget…"

84.     As stated in Section III(D) of the Agreement: "[Plaintiff] will permit [defendant CHARITE] to create an unlimited number of sub-license users without any additional fees, only if the third-party completes the require Morisky Widget training and certification.  This includes any physicians, health care organizations, hospitals, schools, clinics, companies and public health agencies in Germany."

85.     In breach of Sections II(C) and II(D) of the Agreement, defendants CHARITE and DOE DEFENDANTS have failed to have third-party Dr. Meisel trained and certified on the Morisky Widget.

86.     In breach of Sections II(C) and II(D) of the Agreement, defendants CHARITE and DOE DEFENDANTS failed to have defendant SMARTPATIENT trained and certified on the Morisky Widget.

87.    In breach of Sections II(C) and II(D) of the Agreement, Defendants have failed and refused to enter into a sub-license to cure the unauthorized use of the Morisky Widget.

88.    As stated in Section II(B) of the Agreement, defendant CHARITE "agrees to adhere to all the terms and requirements of [the Agreement]…"

89.    In breach of Section II(B) of the Agreement, Defendants did not adhere to all of the terms and requirements of the Agreement, including the above-itemized articles.

90.    As stated in Section II(G) of the Agreement, "[t]he MMAS-8 trademark and copyright requirements provided in Appendix 1 must be included in all manuscripts, web postings or other publications containing Morisky Widget & MMAS results."

91.    In breach of Section II(G) of the Agreement, Defendants failed to include the MMAS-8 trademark and copyright requirements, provided in Appendix 1, in all manuscripts, web postings, or other publications containing the Morisky Widget and MMAS results, including in the above-itemized articles.

92.    On or about September 2, 2017, Plaintiff and defendant CHARITE entered into the Halleck Agreement, as discussed above.

93.    The Halleck Agreement arose as a result of the unauthorized use of 888 MMAS-8 tests by Defendants.

94.    As stated in the Halleck Agreement "[Defendant CHARITE] assures [Plaintiff] that they will score and code all 888 unauthorized MMAS-8 German tests administered to kidney transplant patients through the Morisky Widget…"

95.    In breach of the Halleck Agreement, defendants CHARITE and DOE DEFENDANTS have failed and/or refused to score and code any MMAS-8 tests through the Morisky Widget.

96.    Plaintiff is informed and believes, and based thereon alleges, that the refusal to rescore the tests in the Morisky Widget is due to the work already done by Defendants with regard to the commercial development of the MyTherapy phone app, and the

concern that scoring the tests administered in the Morisky Widget, as required, may yield different results than those reported to developers of the phone app.

97.    As stated in the Halleck Agreement: "[Defendant CHARITE] assures [Plaintiff] that they will…obtain approval by [Plaintiff] before they publish the MMAS-8 test results."

98.    In breach of the Halleck Agreement, defendants CHARITE and DOE DEFENDANTS have failed and/or refused to obtain approval by Plaintiff before they published their test results.

99.    The conduct by defendants CHARITE and DOE DEFENDANTS herein constitute material breaches of the Agreement and the Halleck Agreement.

100.    Pursuant to its rights under Section II (H) of the Agreement, Plaintiff has withdrawn permission for defendant CHARITE to use the Morisky Widget.

101.    Plaintiff fully performed all of its obligations pursuant to the Agreement.

102.    Defendants did not fulfill their obligations pursuant to the Agreement.

103.    As a result of the breaches of the Agreement by defendants CHARITE and DOE DEFENDANTS, Plaintiff has suffered general, direct, and consequential damages, including the expenditures of attorney's fees, those damages all in an amount to be proven at trial.

104.    Asa result of the breaches of the Halleck Agreement by defendants CHARITE and DOE DEFENDANTS, Plaintiff has suffered general, direct, and consequential damages, including the expenditure of attorneys' fees, those damages all in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
## (COPYRIGHT INFRINGEMENT (17 U.S.C. §§ 101, ET SEQ., AS TO ALL DEFENDANTS)

105.    Plaintiff re-alleges each allegation contained in the preceding paragraphs and incorporates them by reference as though fully set forth herein.

106.    At all times relevant hereto, Plaintiff was, and is, the owner of all copyrights or rights to assert copyright claims for the Morisky Widget and all derivative works.

107.    Plaintiff has complied in all respects with the Copyright Act of 1976, the Digital Millennium Copyright Act, and all other laws governing copyrights.

108.    Plaintiff is informed and believes, and thereon alleges, that Defendants, without authorization, have infringed and will continue to infringe the Morisky Widget copyright by using, copying, counterfeiting, distributing, or otherwise exploiting the same outside of the confines of the Agreement, or any other valid agreement.

109.    Upon information and belief, Defendants have improperly and/or illegally copied the software contained in the Morisky Widget to create an unauthorized derivative.

110.    Defendants' copying of the software, without approval or authorization, infringes Plaintiff's exclusive copyrights in the software pursuant to 17 U.S.C. § 501.

111.    Due to Defendants' material breach of the Agreement, as evidenced by their conducted described herein, Plaintiff, pursuant to its rights under Section II(H) of the Agreement, has withdrawn permission for Defendants any use of the Morisky Widget.

112.    Accordingly, Defendants do not have a license to use the Morisky Widget at this time.

113.    When Plaintiff entered into the Agreement, it was only aware of the uses of its copyrighted works which are the subject of the Agreement.  The license detailed within the Agreement was designed to allow studies conducted pursuant to expiring licenses, to continue, and to allow defendant CHARITE to issue sub-licenses, provided the users were trained and certified, and provided that a fee for the training and certification was paid.

114.    Plaintiff is informed and believes that for some time prior to the execution of the Agreement, Defendants were using the Morisky Widget source code and translations for development and/or testing of the aforementioned MyTherapy app.

115.   This use described with regard to the MyTherapy phone app, or any use not included in the Agreement, was not authorized and infringed on the copyright held by Plaintiff.

116.   Plaintiff is informed and believes, and based thereon alleges, that this use with regard to the MyTherapy phone app continued after the execution of the Agreement.

117.   Studies done by Defendants were for their financial benefit without the knowledge, consent, or authorization of Plaintiff.

118.   Defendants' infringement of the Morisky Widget copyright was intentional, knowing, willful, and malicious.

119.   Plaintiff is entitled to an injunction restraining Defendants, and all persons acting in concert with them, form engaging in further such acts in violation of applicable copyright laws.

120.   As a direct result of Defendants' infringement, Plaintiff has sustained damages in an amount above the jurisdictional limit of this Court and to be determined at trial.

121.   Pursuant to 17 U.S.C. §§ 502, 503, 504, and 505, Plaintiff is entitled to an award of actual damages, injunctive relief, the impoundment and destruction of the infringing materials, and its attorneys' fees and costs against all Defendants.

122.   Plaintiff is entitled to statutory damages for infringement of the Morisky Widget copyright by Defendants.

## THIRD CAUSE OF ACTION
## (UNFAIR COMPETITION AS TO ALL DEFENDANTS)

123.   Plaintiff re-alleges each allegation contained in the preceding paragraphs and incorporates them by reference as though fully set forth herein.

124.   Plaintiff is informed and believes, and based thereon alleges, that at the time of entering into the Agreement, Defendants were working on the commercial

development of the MyTherapy phone app using the Morisky Widget source code and translations without either license or authority.

125.   Defendants have committed all of the aforesaid acts willfully, maliciously, and oppressively, without regard to Plaintiff's legal, contractual, and exclusive proprietary rights.

126.   Defendants' acts and practices, as detailed above and throughout, constitute acts of unlawful, unfair, or fraudulent business acts and practices within the meaning of California Business and Professions Code § 17200.

127.   Pursuant to California Business and Professions Code § 17203, Plaintiff seeks an order from this Court prohibiting Defendants from engaging, or continuing to engage in, the unlawful, unfair, or fraudulent business acts or practices set forth herein.

128.   Plaintiff has incurred, and will continue to incur, attorneys' fees in enforcing the rights described herein and seek recovery of their attorneys' fees incurred pursuant to Code of Civil Procedure § 1021.5.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that this Court enter judgment in its favor and against Defendants as follows:

1.   For actual damages in an amount according to proof at trial, and for any additional profits attributable to infringement of Plaintiff's Morisky Widget copyright, in accordance with proof at trial;

2. For statutory damages for copyright infringement of the Morisky Widget copyright by Defendants;

3. For issuance of preliminary and permanent injunctive relief against Defendants, and each of them, and their respective officers, agents, representatives, servants, employees, attorneys, successors, and assigns, and all others in active concert or participation with Defendants, enjoining them to:

   a.   Refrain form using the Morisky Widget, Morisky Widget translations, and Morisky Widget diagnostic assessments until corrective measures are

agreed upon, including the maintenance on websites, posted on the internet, or in any publication, the articles, the publications, and reports described herein, or any such articles, publications, and reports in the future which use or reference the Morisky Widget or Morisky Widget diagnostic assessments;

    b. Deliver upon oath, to be impounded during the pendency of this action, and for destruction pursuant to judgment herein, all originals, copies, facsimiles, reproductions, or duplicates of any work shown by the evidence to infringe the Morisky Widget;

4. Order that Defendants file with this Court, and serve upon Plaintiff, within thirty (30) days after service on Defendants of an injunctions in this action, a report by Defendants, under oath, setting forth that Defendants have complied with the injunction, as well as the steps they have taken to comply;

5. Order declaring that Defendants have infringed the Morisky Widget copyright;

6. Order declaring that defendant CHARITE has breached the Agreement and finding that Plaintiff has been damaged by the acts of defendant CHARITE;

7. Order declaring that Plaintiff has been damaged by the acts of Defendants;

8. Order for Defendants to account for, and disgorge, to Plaintiff all profits derived by Defendants from their tortious, breaching, and infringing acts;

9. For compensatory damages in an amount according to proof at trial;

10. For costs of suit herein incurred;

11. For attorneys' fees;

12. For prejudgment interest in the amount of ten percent (10%) per annum or the maximum amount allowed by law; and

13. For such other and further relief that the Court deems just and proper.

Plaintiff demand a jury trial on all issues so triable.

Dated: December 5, 2022

**THE LAW OFFICE OF PAUL S. HABERMAN LLC**

By:    /s/ Paul S. Haberman

Paul S. Haberman, *Pro Hac Vice*
Attorney for Plaintiff,
MMAS RESEARCH LLC